# IN THE COURT OF APPEALS OF IOWA

No. 20-0747
Filed June 16, 2021

IN THE MATTER OF THE ESTATE OF HAZEL M. BRONNER

**KENNETH BRONNER, SR.**
        Plaintiff-Appellee,

**vs.**

**RONALD BRONNER,**
        Defendant-Appellant.

_____

IN THE MATTER OF THE WILLIAM C. BRONNER FAMILY TRUST

**KENNETH BRONNER, SR.**
        Plaintiff-Appellee,

**vs.**

**RONALD BRONNER,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Winneshiek County, Kellyann M. Lekar, Judge.

Ronald Bronner appeals the district court's denial of his claims for reimbursement against his mother's estate and family trust. **AFFIRMED.**

Jason Burns of Miller, Pearson, Gloe, Burns, Beatty & Folta, P.L.C., Decorah, for appellant Ronald Bronner.

Andrew J. Casper of Putnam, Thompson & Casper, P.L.L.C., Decorah, for appellee Kenneth Bronner.

Scott D. Brown of Brown, Kinsey, Funkhouser & Lander, P.L.C., Mason City, and Collin M. Davison of Laird Law Firm, P.L.C., Mason City, for appellee First Citizens Bank as Executor of the Hazel M. Bronner Estate and Trustee of the William C. Bronner Family Trust.

Considered by Mullins, P.J., and May and Schumacher, JJ.

**SCHUMACHER, Judge.**

Ronald Bronner appeals the district court's denial of his claims for reimbursement against his mother's estate and family trust for payments he alleges he made on his mother's behalf during her lifetime. Because the district court's denial of the claims is supported by substantial evidence, we affirm the district court's decision.

## I.      Facts & Prior Proceedings

William and Hazel Bronner raised five sons on their 276-acre family farm.[1] William and Hazel owned the farm as tenants in common. In 1990, William passed away. His will provided for the residue of his estate, including his one-half interest in the farm real estate, to be held in the William Bronner Family Trust [hereinafter "Trust"] and named one of his sons, Ronald, as trustee. The will instructed that the Trust be held for the lifetime of Hazel and authorized payments of income and principal to her deemed necessary or advisable by the trustee. The Trust was to be terminated upon Hazel's death and the remaining assets distributed equally among the surviving children.

After William's death, Ronald and Hazel continued to operate the farm. Ronald rented land for his own farming operation from his mother and the Trust. Ronald did not own any individual interest in the farm. By 1998, Hazel had ceased working the farm and relied on farm rent and social security for income. During this time, Hazel, or Ronald acting as trustee, executed promissory notes secured

---

[1] Kenneth is the oldest son, followed by Richard, Eugene (deceased), Ronald, and Raymond (deceased).

by mortgages on the farm to Cresco Union Savings Bank.[2] In 2010, the outstanding notes were consolidated by Hazel and Ronald, acting as trustee, executing a promissory note in the amount of $331,348.35, secured by a mortgage on the farm. Beginning the next year, annual loan payments of $25,528.35 were due to Cresco Union Savings Bank.

Going forward, Ronald would pay his annual farm rent by depositing into his mother's account roughly the amount necessary to cover the loan payment and real estate taxes on the farm.[3] Hazel would then write checks to cover the loan payment and pay the real estate taxes.[4] Additionally, during this time, Ronald made insurance premium payments to Winneshiek Mutual Insurance.[5]

In October 2015, Ronald sought to sell a portion of the farm real estate.[6] Around this time, Hazel's cognitive function began to decline, and by February 2015, she was not competent to enter into contracts.[7] In January 2016, Ronald arranged for the sale of a 76.11-acre parcel of farm real estate to an adjoining landowner through private sale for $275,000.[8] The net proceeds of the sale were paid to reduce the amount owed on the consolidated debt.

---

[2] The farm was encumbered by six outstanding notes. One of the notes was executed by Hazel in 1987, prior to William's death.

[3] In the present action, Ronald contends that payment of real estate taxes and insurance premiums were not a part of his farm rent.

[4] The loan payments were automatically made from Ronald's account beginning in 2015.

[5] The annual premium was roughly $1000 to be split between Ronald and Hazel.

[6] Ronald hired Benjamin Harman to appraise the fair market value of the farm. The appraisal valued the total farm at $1,445,000 and assessed the land by dividing it into three sections. The "south portion" was valued at $456,000.

[7] In previous litigation, the court found Hazel was not competent to enter into contracts after February 2015.

[8] The parcel comprised mostly of land from the south parcel. Ronald executed the deed as trustee, and Hazel signed the deed as a tenant in common.

On July 5, 2016, Hazel passed away. Hazel's last will and testament mirrored William's will, insofar as if Hazel survived William, the estate was to pass equally to the children. On July 6, Ronald petitioned to probate Hazel's estate, and he was appointed the executor of the estate.

The parties relevant to this appeal, mainly Ronald and his older brother Kenneth, have been involved in two previous court proceedings. The first occurred shortly before Hazel's death, wherein Kenneth brought an action against Ronald making claims of elder abuse and seeking the appointment of a guardian and conservator on behalf of Hazel. In late June 2016, the matter was resolved by the parties entering into a stipulation and agreement in which Kenneth agreed to dismiss his allegations of elder abuse in exchange for a court-appointed guardian and conservator for Hazel.[9]

The second action occurred after Hazel's death. Kenneth brought an action seeking to remove Ronald as executor and alleging Ronald breached his fiduciary duties as trustee by paying farm rent at less than market value and in selling the 76.11-acre parcel of land for less than its market value, among other things. The matter proceeded to trial.

The district court found Ronald breached his fiduciary duties in selling the 76.11-acre parcel. The court removed Ronald as trustee and Ronald was not compensated for his services. The court also found Ronald was not suitable to serve as executor of the estate and he was removed. The appellee in the present case, First Citizens Bank, was subsequently appointed executor and trustee. Each

---

[9] Whitney Schiller was appointed as the temporary guardian for Hazel and Decorah Bank and Trust was appointed as conservator.

party was ordered to pay their own attorney fees. The district court in the present case took judicial notice of the findings in the previous action.

The district court's findings in the earlier action include a provision stating, "Since becoming executor of the estate, Ronald has paid certain expenses from his own resources, as his mother's estate had insufficient cash assets to pay these obligations. The expenses he reports paying individually are the following:"

| Funeral expenses | $14,530.59 |
|---|---|
| Nursing home/medical expenses | $20,132.26 |
| Whitney Schiller | $4107.28 |
| Erik Fern | $3000 |
| Miller Law | $15,541.00 (still owes $4406.51) |
| Taxes and insurance | $7951.61 |
| Winneshiek Mutual payments (8/25/17 & 8/29/17) | $490.83 |
| Bank payment on loan 31011821 | $28,785.28 |
| TOTAL: | $94,538.85 |

## II. Present Action

On February 20, 2019, after he was removed as trustee and executor, Ronald filed claims in the pending estate proceedings for "expenditures that he has made on behalf of his mother and the William C. Bronner Family Trust on the dates indicated and in the amounts shown." To present his claims, Ronald attached to the filing a spreadsheet with seventy-eight entries, each with a corresponding date, description of the "company & service provided," and its cost. The entries are dated from August 20, 1999, to November 27, 2018, totaling $199,941.86.[10]

---

[10] The date of the second publication of Hazel's estate was July 20, 2016.

The estate and Trust contested the claims, and the matter was set for hearing on August 29, 2019. In its written ruling, the district court denied all of Ronald's claims. The court found,

> Ronald does not provide the Court with any legal authority or any legal basis upon which the Court can determine that Ronald may sustain claim against the Estate of Hazel Bronner or the Trust of William Bronner. He has not maintained his burden as a claimant in this matter to establish that his claim is justly due.

Ronald appeals the district court's ruling and Kenneth joins First Citizens Bank as appellee. In light of the facts established at trial, Ronald revised his claim on appeal with regard to some expenses. Ronald asks this court to "reverse the trial court's decision and find in favor of the Appellant's claim in the amount of $172,665.03."[11] Ronald notes, "It was concluded in the evidence that the bank loan payment of $28,785.28 should not be included in the claim and $25,000.00 should be deducted. Similarly, the $490.83 to Winneshiek Mutual and $1786.00 to the Winneshiek County Treasurer should not be included."

## III. Analysis

### A. Standard of Review

We review contested claims in probate proceedings for corrections of errors of law. Iowa Code § 633.33 (2019) ("Actions . . . for the establishment of contested claims shall be triable in probate as law actions"); *see In re Est. of Voelker*, 252 N.W.2d 400, 402 (Iowa 1977). The district court's findings of fact have the effect of a special verdict and are binding on this court if supported by substantial

---

[11] Ronald calculates this amount, stating, "$199.941.86 minus the $25,000.00 rent payment, $1786.00 to Winneshiek County Treasurer and $490.83 Winneshiek Mutual Insurance Payments."

evidence. *See* Iowa Code § 633.33; Iowa Rs. App. P. 6.907, 6.904(3)(a). "In determining whether substantial evidence exists, we view the evidence in the light most favorable to the district court's judgment." *Chrysler Fin. Co. v. Bergstrom*, 703 N.W.2d 415, 418 (Iowa 2005).

In a probate action tried at law, the claimant must prove their claim by a preponderance of the evidence. *Carlson v. Bankers Tr. Co.*, 50 N.W.2d 1, 6 (Iowa 1951) ("In such a probate action as this, tried as an ordinary action at law, only a preponderance of evidence is required."); *In re Newson's Est.*, 219 N.W. 305, 310 (Iowa 1928); *In re Est. of Dolmage*, 213 N.W. 380, 382–83 (Iowa 1927) (discussing the burden of proof in equity actions and at law actions). "[W]hen a trial court finds the facts against the party having the burden of persuasion, we reverse on the facts only if that party proved his case as a matter of law." *In re Est. of Gauch*, 308 N.W.2d 88, 91 (Iowa 1981). "We will conclude a party has carried such a burden only when the evidence is so overwhelming that only one reasonable inference on each critical fact issue can be drawn." *Schmitz v. Crotty*, 528 N.W.2d 112, 115 (Iowa 1995).

### B. Ronald's Claims

Ronald's seventy-eight individual claims arise from various invoices directed at him, his mother, or Hazel's estate, as well as checks written by him or Hazel for various expenses, some of which correspond to the expenses noted in the earlier district court order. Ronald's claims may be fairly categorized as (1) farm maintenance/capital improvements, (2) taxes and insurance, (3) costs of appraisal, (4) costs associated with prior litigation, and (5) funeral and nursing home/medical expenses.

### 1. Farm Maintenance/Capital Improvements

Ronald's claims of reimbursement include twenty-seven invoices he asserts represent expenses he paid from 1999 through 2018 to maintain and improve the farm and for which he had an implied agreement with his mother that he would be paid back. Generally, the invoices are directed to Ronald and are for things such as building materials, rock, and water management systems. Ronald contends that because his mother had little funds to cover the expenses, he paid them on his mother's behalf. Ronald argues that the invoices directed to him, coupled with his testimony that he paid the expenses with an implied understanding of repayment, establish his claims.

The district court denied Ronald's claims for farm maintenance expenses, finding he had not established his claims were "justly due" because he had not shown that he himself had paid the expenses or established there was an expectation of repayment between himself, his mother, or the Trust. *See In re Est. of LeClere v. LeClere*, No. 10-0337, 2010 WL 3503809, at *3 (Iowa Ct. App. Sept. 9, 2010) ("To be considered an allowable claim, the amount sought from the estate must be 'justly due.'" (citation omitted)); *In re Est. of Loy*, No. 12-0766, 2013 WL 1759930, at *4 (Iowa Ct. App. April 24, 2013) ("The estate shall not allow a claim unless the amount is justly due." (quotation omitted)).

The various invoices, receipts, and checks presented by Ronald suggest that certain expenses were incurred and paid to make capital improvements on the farm. However, they do not conclusively prove he personally paid the expenses with an understanding of reimbursement. *See In re Gollobit's Est.*, 3 N.W.2d 191,

193 (Iowa 1942) ("We have always held . . . that a check drawn . . . is no more than a receipt and as such is susceptible of explanation . . . .").

Ronald testified his mother was aware he was spending money to improve the farm and that there was an implied understanding he would be paid back, but he was unable to clearly articulate how the expenses arose and whether they were attributable to Hazel, the Trust, or his own farming operations.

Ronald argues the testimony is uncontested and the nature and circumstances of the expenses should establish his claims. However, the Iowa Supreme Court has stated of a claimant's testimony that an agreement existed between himself and the deceased,

> It is incumbent on the court to look upon such evidence with great jealousy, and to weigh it in the most scrupulous manner, to see what is the character and position of the witnesses generally, and whether they are corroborated to such an extent as to secure confidence that they are telling the truth.

*Holmes v. Connable*, 82 N.W. 780, 781 (Iowa 1900) (quoting *Wallace v. Rappleye*, 103 Ill. 229, 241 (Ill. 1882)); *In re Larsen's Est.*, 15 N.W.2d 919, 921 (Iowa 1944) ("Testimony of this sort is to be cautiously received.").

Further, the district court did not find Ronald's testimony credible, stating,

> Most importantly, this Court did not find Ronald credible as to his assertions that he paid certain bills on behalf of his mother, that he made certain deposits to his mother's account for which he is due reimbursement or that there was any expectation between himself and his mother or between Ronald and the Trust that reimbursement would be made for those items that Ronald may have paid with regard to farm maintenance or management.

It is for the district court "to determine the credibility of witnesses and the weight of the evidence." *Roth v. Headlee*, 29 N.W.2d 923, 924 (Iowa 1947). Unless Ronald

established his claims as a matter of law, we are bound by the district court's determination. *Id.*

Ronald makes claims for farming expenses beginning in 1999 through 2018. It is uncontested that Hazel had stopped working on the farm by 1998 and relied on farm rent as income. During this time, Ronald was renting the land from his mother and the Trust and maintaining his own farming operation on the land. The majority of expenses incurred were for improvements to outbuildings, water and electric systems, road and land maintenance, or the household, all of which Ronald used in his own farming operations or otherwise benefitted from. *See Soderland v. Graeber*, 180 N.W.2d 745, 746 (Iowa 1921) (explaining that to establish a claim against his mother's estate the claimant-son must rebut the presumption of gratuitous services by showing an agreement of reimbursement); *In re Est. of Thole*, No. 16-0009, 2016 WL 4384863, at *2 (Iowa Ct. App. Aug. 17, 2016) (affirming the district court's denial of a son's claim seeking reimbursement for payment of property taxes made after the mother's death, agreeing the son voluntarily conferred benefit onto the estate for which it did not request or knowingly accept).

Ronald submitted records of deposits into his mother's account, which he asserts represent advancement of payment for some of these expenses. However, the deposits into Hazel's account offer no further proof that Ronald paid the farm maintenance expenses or advanced payment to Hazel for them with the expectation of repayment. The amounts deposited do not correspond with the costs of the various expenses but are payments in amounts roughly equal to the annual debt payment and real estate taxes or insurance premiums.

Ronald's assertions that the deposits represent anything other than rent are discredited by his own admissions. At trial on direct examination, Ronald initially claimed a 2017 payment of $25,000 was to pay his mother's debt and was not to be considered payment of farm rent; however, on cross-examination, Ronald admitted he never paid farm rent in 2017, and in closing arguments, conceded that the payment should be credited towards rent and not considered an advancement.

Further, in his trial brief from the second prior proceeding, Ronald characterized his payment of various expenses as a part of his farm rent, stating, "Ron went in annually [to the bank] from 2011–2015 and paid his mother's bank debt bill, real estate taxes and *other miscellaneous expenses* for farm rent." (emphasis added). Additionally, in his post-trial brief from the litigation, Ronald stated, "It was the efforts of Ron and the payment of the rent plus payment of the real estate taxes and *other miscellaneous expenses* as farm rent that kept the bank satisfied." (emphasis added).

We find substantial evidence supports the district court's conclusion that Ronald did not establish his claims for farm maintenance expenses. The invoices submitted by Ronald do not establish that he paid the expenses. Ronald's testimony alone does not establish an implied agreement for reimbursement. Many of the capital expenditures and improvements benefited his own farming operation. The district court's finding that Ronald's testimony was not credible is supported by the record, including his contradictory characterizations of what was included in his rent.

We affirm the district court's denial of Ronald's claims for farm maintenance expenses. *See Loy*, 2013 WL 1759930, at *4 (affirming the district court's denial

of a son's claim for reimbursement of farm expenses from the father's estate where evidence indicated deposits were made pertinent to farm expenses but the district court found the son's testimony "self-serving, unsubstantiated, and unreliable," denying the claims because the son "did not present credible evidence the estate owed him the amounts claimed").

## 2. Tax and Insurance Payments

Ronald has made claims for payments of real estate taxes and farm insurance premiums. According to Ronald, prior to his mother's death, he and his mother engaged in a similar series of transactions for paying real estate taxes and insurance premiums as they did for Ronald's rent and the servicing of the farm debt. Ronald asserts these deposits and payments were not a part of the rent he owed but were advanced to his mother with an expectation of repayment because she had insufficient funds to cover the expenses. Additionally, Ronald seeks reimbursement for direct payments of taxes and insurance that occurred after his mother's passing that he claims to have made on behalf of the estate.

Prior to Hazel's passing, from 2010–14, there is evidence that Ronald deposited roughly $4000 into his mother's account on an annual basis to cover real estate taxes. However, these payments were often made near the same time as rent payments, and Ronald's own admissions indicate these expenses were to be considered a part of his farm rent. As noted, in previous litigation, Ronald explicitly characterized his rent to include tax and insurance payments.[12] Ronald's

---

[12] In Ronald's deposition from the second action, Ronald stated he paid "[r]oughly 30,000 a year plus the taxes I think it—taxes were 4,200—$4,200" in rent. Additionally, Ronald's trial brief from the litigation states in pertinent parts: "[Ronald] also paid taxes, insurance and the like as rent," "he also paid real estate

attorney acknowledged this in the present case during his rebuttal to the estate's closing argument, stating,

> And it does appear in [the prior district court] findings that those real estate payments were included as rent, for instance, the 2014 one is precisely what was paid for real estate taxes.
> So if–if during the periods of time in question, if the real estate–if the real estate taxes are included then and the calculations are removed from the claims because they were applied to rent, then that would seem to be consistent with the previous findings, but nothing beyond that.

Ronald is not entitled to reimbursement for his payment of farm rent. As the district court noted,

> Paying Ronald's claim for repayment of those payments would essentially mean paying him back rent he owed to his mother. Indeed, some of the claims Ronald now puts forth for reimbursement could be characterized as a form of "double-dipping" as he received the benefits of the payments made, but now want to be reimbursed.

Ronald also seeks reimbursement for direct payments of tax and insurance expenses he claims to have made after his mother's death. However, checks and bank records presented by the estate clearly show that many of the claims Ronald is seeking reimbursement for were, in fact, paid by the estate. Further, at trial, under cross-examination, Ronald admitted that he did not pay some of these expenses and incorrectly included them in his claims.

For instance, Ronald made a claim for a tax payment dated September 14, 2016, in the amount of $1717.00. He offered exhibit WW in support of the claim,

---

taxes as part of his rent," "Ron went in annually from 2011-2015 and paid his mother's bank debt bill, real estate taxes and other miscellaneous expenses for farm rent." His trial brief also states the tax records of Hazel and Ronald both reflect that Ronald paid $4184 in 2014 as farm rent. Finally, as previously noted, Ronald's post-trial brief from the litigation states in pertinent part, "payment of the real estate taxes and other miscellaneous expenses as farm rent."

a receipt from the Winneshiek County Treasurer; however, the document states that payment was received from the estate. Indeed, bank records presented by the estate confirm the check was issued from the estate's bank account, and Ronald did not pay it.

A similar pattern emerges in regards to insurance payments. Ronald made a claim for $473.69 to Winneshiek Mutual dated August 24, 2017, and offered exhibit DDD, an invoice indicating payment dated the same. However, the estate presented a check showing that payment was made by the estate. Similarly, Ronald made a claim for $483.65 dated August 23, 2018, and offered exhibit III, an invoice indicating payment was made. However, the estate offered a check showing it was the estate that made the payment.

Additionally, included in Ronald's claims is an entry for $1940.48 to Winneshiek Mutual on November 28, 2017. To support the claim, Ronald offered exhibit FFF; however, the submitted document is not an invoice or receipt of any payment made. It is a summary of the farm insurance policy, and the $1940.48 amount represents the annual premium on the policy. At trial, on cross-examination, Ronald acknowledged the exhibit was not an invoice, he did not pay anything in relation to the document, and it should not be included in his claims.

Finally, Ronald made a claim for $525.67 dated November 27, 2018, and offered exhibit JJJ, an invoice indicating payment was made on that date. However, at trial, Ronald testified that he did not personally pay this expense and incorrectly included them in his claims, stating, "I never paid nothing after–you know, after she passed away really, unless I used the bank's–the made-out

checks." In closing arguments, Ronald's attorney conceded that this claim should not be included.

Despite many of his initial claims being revealed as unsubstantiated, Ronald urges that his inclusion of a few erroneous claims does not discredit his claim altogether but that his claims "can be mathematically easily adjusted." However, our review is for corrections of law; the district court's denial of all of Ronald's claims is binding unless it is not supported by substantial evidence. *See Griffiths v. Smith*, 183 N.W. 600, 602 (Iowa 1921) ("This court cannot undertake, on its own motion and without evidence on the subject, to reduce the allowance. The proceeding is at law, and the findings of the trial court have all the force and effect of a jury verdict.").

We find substantial evidence supports the district court's conclusion that Ronald has not established he is entitled to reimbursement for taxes and insurance expenses. Ronald's own admissions indicate that deposits made to his mother's account were for payment of farm rent for which he is not entitled to reimbursement. The invoices and statements offered by Ronald do not establish he made the payments, and his claims are discredited by his own admissions and proof that some were paid by the estate. We affirm the district court's denial of Ronald's claims for tax and insurance expenses.

### 3.    Cost of Appraisal

Ronald's claims include expenses incurred in appraising the farm real estate and in anticipation of the sale of the 76.11-acre parcel. Ronald submitted invoices directed to him as trustee related to the 76.11-acre parcel for appraisal services, a land survey, and a title and abstract. Additionally, Ronald made a claim

for a later appraisal, which was relied upon in the estate's report and inventory[13] and includes appraisal of a separate ten-acre parcel Ronald had planned to sell for his own benefit.

The district court denied Ronald's claims finding, "Ronald asserts claims that are in disregard to [the] prior ruling . . . ." and noting, "[Ronald] also wants reimbursement for appraisal expenses for appraisals that were undertaken at his request for his benefit and with no identifiable benefit to [his] mother or the Trust."

As noted, the sale of the 76.11-acre parcel was found to be below the fair market value, and Ronald breached his fiduciary duties as trustee by executing it. As a result of the improper sale, Ronald was removed as trustee and ordered not to be compensated for his services. The related invoices Ronald submitted are directed to him as trustee. During the time of the sale of the 76.11-acre parcel and going forward, Hazel was not competent to enter into contracts. The subsequent appraisal was Ronald's own initiative not undertaken with respect to his duties as executor, and the contemplated sale of a ten-acre parcel was for his own benefit. *See Est. of Thole*, 2016 WL 4384863, at *2 (agreeing son acted officiously in conferring benefit estate did not request or knowingly accept).

We find substantial evidence supports the district court's conclusion and affirm the denial of Ronald's claims for appraisal costs. *Est. of LeClere*, 2010 WL 3503809 at *3−4 (affirming the district court's denial of the testator's son's claim for reimbursement from his mother's estate for the cost of a land survey he

---

[13] Ronald, as executor, filed the report and inventory for the estate on September 6, 2016. The report values the farm real estate using the later appraisal. However, the effective date of the appraisal is March 11, 2016, approximately four months before Hazel's death.

commissioned three years prior to her death, finding that absent any provision in the probate code authorizing repayment and no evidence the mother agreed to reimburse the son, the claim was unestablished).

### 4. Costs Associated with Prior Litigation

Ronald made four claims related to legal expenses he incurred during the prior proceedings previously discussed. The district court denied these claims, finding, "Ronald asks for reimbursement from the Estate for certain expenses he was court-ordered to pay as part of prior litigation."

Ronald's first two claims arise directly from the earliest litigation shortly before Hazel's death. Pursuant to the stipulation entered into by the parties, the court-appointed conservator was "directed to pay court costs and all attorney fees for Whitney Schiller" and "$3,000.00 in attorney fees" to each parties' attorney's law firm. Despite the court order, Ronald seeks reimbursement of $4107.28 for Whitney Shiller's guardian ad litem fees and $3000.00 for payment to Kenneth's attorney.[14] Ronald presented a letter indicating that payment to Kenneth's attorney was issued on his check, but he had no duty to make this payment, and it does not conclusively entitle him to reimbursement. *See Est. of Thole*, 2016 WL 4384863, at *2.

---

[14] In support of his claims, Ronald submitted exhibit RR, Schiller's statement of fees filed with the court. Additionally, Ronald submitted exhibit PP, a letter from his attorney to Kenneth's attorney. The letter states in part, "This is a Ron Bronner check, but the banker recommended that Ron simply pay the bills in order to make sure they are done and out of the way with the expectation that they will in turn be included in the bank loan against Hazel's farm real estate." The record offers little further explanation with regard to this payment and the indicated arrangement between Ronald, Hazel's conservatorship, the banker responsible for Hazel's conservatorship, and an apparent future bank loan against Hazel's real estate.

Ronald's other two claims for legal fees are both directed at the "Miller Law Firm."[15] To support these claims, Ronald offered exhibit HHH, a statement of account from Miller Law for services rendered beginning April 7, 2016, through January 7, 2019. The statement lists services provided through the prior two actions and up until shortly before Ronald filed his claims in the present case.

The document states total services rendered as $38,744.95 and total payments made as $15,541.00, leaving a remaining balance of $23,203.95. Ronald seeks reimbursement in the amount of $11,113.60 for fees allegedly already paid and $23,203.95 for fees outstanding.

Ronald asserts "that [the prior district court's] rulings have already established a legal basis for reimbursing Ron for . . . the legal expenses from family litigation brought by his brother, Kenneth against Ron as the trustee and on behalf of his mother."[16] However, Ronald has not adequately explained which costs and payments detailed in the statement of services are attributable to the amounts denoted in the district court's order, how they are to be allocated between the litigation involving Hazel's care and the subsequent proceedings, or how these amounts relate to Ronald's claims of $11,113.60 for fees already paid and $23,203.95 for fees outstanding.[17]

---

[15] We note that Ronald has been represented by the "Miller Law Firm" throughout the discussed litigation and continues to be on appeal.

[16] The previous district court's order states the amount related to Miller Law as "$15,541.00 (still owes $4,406.51)."

[17] In his Rule 1.904 brief, Ronald attempts to clarify by stating, "The Miller Law Firm expenses appear as Exhibit HHH as $11,113.60 and [the district court] had previously ruled that there was $15,541.00 with $4,406.51 still owed. The lower amount are those fees specifically associated with the case involving Hazel, Hazel's guardianship and Ron's job as trustee and executor . . . ." However, this explanation is unclear as to which "lower amount" Ronald is referencing, the

In the second action, the district court ordered that each party pay their own attorney fees. Through his two claims directed at Miller Law, Ronald is seeking an amount equal to the total bill for services rendered, less $4427.40. Presumably, the lesser amount claimed represents a portion of the payment made for which Ronald concedes he is not entitled to reimbursement. However, Ronald does not clearly explain what the $4427.40 deduction is attributable to.[18] The testimony elicited by Ronald's attorney at trial seems to indicate that his claims for reimbursement are directed at the first litigation, and the $11,113.60 amount represents these costs. However, Ronald also seeks $23,203.95 for unpaid legal fees, an amount equal to the total outstanding balance due to Miller Law.[19] These fees include those incurred during the second action in which the district court ordered that each party pay their own legal fees.

Ronald has not demonstrated how his claims are to be allocated between the previous actions, and when his claims are considered together, he seeks payment for legal services he was ordered to pay. We find substantial evidence supports the district court's conclusion that Ronald has not established he is entitled to reimbursement for legal expenses.

---

$4406.51 with respect to the $15,541.00 in the order itself, or Ronald's claim of $11,113.60 with respect to $15,541.00. It is also unclear whether the amount is only attributable to the first action, as the explanation states the case was brought against Ronald in his role as executor.

[18] We note the difference does not precisely align with the $4406.51 amount denoted as still owing in the district court's findings.

[19] Total services rendered $38,733.95, less $15,541.00 already paid. We note the amount paid is equal to the amount the district court noted Ronald reported incurring at the time of the second action.

### 4.    Funeral and Nursing Home/Medical Expenses

Ronald's remaining claims are for funeral and nursing home/medical expenses. Ronald asserts that the district court's findings in the previous action establish a legal basis for his claims, and he is "entitled as a matter of law to be reimbursed f[rom] the Estate for advancing these final expenses." However, that district court order did not make a determination of whether Ronald was entitled to repayment for the amounts he reported paying. The court removed Ronald as executor and trustee in part because he intended to make future claims against the estate and Trust in which that issue would be determined. The court's order detailing what Ronald reported he paid does not establish he is entitled to reimbursement.

Outside of the district court's order, Ronald relies on exhibit QQ, a funeral home invoice. The invoice does not detail who paid the funeral expense. Ronald's testimony at trial offers little further assurances that he paid the expense. He testified, "I think I paid the funeral home." He offered no proof of payment. To support his claims associated with nursing home expenses, Ronald offered exhibits JJ, KK, and MM, which are resident statement invoices. The first invoice indicates that payment was received from Hazel, the second does not indicate any payment was made, and while the third indicates that payment was made, it does not describe who made the payment. Ronald testified that his previous attorney told him to pay these expenses and that he did out of his own funds. However, the check number reflected in exhibit OO does not correlate with any of the nursing home bills submitted by Ronald.

The district court found, "Ronald admitted he has no proof to show he paid certain expenses included in Exhibits JJ, KK, MM, OO and others." Ronald argues his claims should be recognized because "[t]he exhibits were accurate and his testimony that he paid it was unchallenged." However, it remains Ronald's burden "to plead and prove [the] propriety [of his claims] rather than upon the administrator to plead and prove their impropriety." *In re Ewing's Est.*, 14 N.W.2d 633, 636 (Iowa 1944) (holding that claimant has the burden of establishing and proving the propriety of funeral expenses). To disallow a claim, the estate is not required to rebut a claimant's assertions. *See In re Rich's Estate*, 200 N.W. 713, 719 (Iowa 1924) ("Such claims are not necessarily established because the evidence is not denied."). "[A] mere failure to produce direct contradiction to the testimony of a witness does not necessarily entitle such testimony to be deemed as true." *Schulte v. Ideal Food Prod. Co.*, 213 N.W. 431, 432 (Iowa 1927). "In the absence of an admission by the adverse party, it is not often that one who has the burden on an issue establishes his claim as a matter of law." *Roth*, 29 N.W.2d at 924.

While the nature and circumstances of funeral home and nursing home/medical expenses may typically suggest an expectation of reimbursement, the district court found that Ronald had not sustained his burden, and upon our review, we do not find Ronald established it as a matter of law such that the evidence is "so overwhelming that only one reasonable inference on each critical fact issue can be drawn." *See Schmitz*, 528 N.W.2d at 115; *Pub. Fin. Co. v. Van Blaricome*, 324 N.W.2d 716, 718 (Iowa 1982); *Olson v. Roberts*, 255 N.W. 461, 461 (Iowa 1934). ("The finding of the trial court is binding upon us unless we must say that it had no support in the evidence.").

The previous district court order made no determination with respect to Ronald's entitlement to reimbursement for his claims. The invoices offered by Ronald prove only that payment was made for these expenses, and the estate is not required to rebut Ronald's assertions that he paid them. Ronald's testimony concerning the invoices was equivocal. The district court's finding that Ronald was not credible is supported by Ronald's own admissions.

We affirm the district court's denial of Ronald's remaining claims for funeral and nursing home/medical expenses.

## IV. Conclusion

We find Ronald has not established his claims as a matter of law. Substantial evidence supports the district court's denial of his claims. Accordingly, we affirm.

**AFFIRMED.**